Brent LAWSON, Plaintiff,

v.

DALLAS COUNTY, et al., Defendants.

No. CA 3:95–CV–2614–R.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 29, 2000.

Maureen Noble Armour, Ashley Wilkes Warren, Dallas, TX, Adam G. Schachter, Hitchery Law Office, Dallas, TX, for Plaintiff.

Dolena T. Westergard, Dallas County Dist. Attys. Office, Dallas, TX, for Defendants.

## MEMORANDUM OPINION

BUCHMEYER, Chief Judge.

Plaintiff Brent Lawson asserts claims against Defendants Dallas County, Dallas County Sheriff Jim Bowles, and James Farris, the Chief Medical Officer of the Dallas County Jail, pursuant to 42 U.S.C.A. § 1983 for allegedly maintaining a policy, procedure, custom, and practice of being deliberately indifferent to Mr. Lawson's medical needs, causing him to develop decubitus ulcers and preventing proper treatment of those ulcers. This opinion states the procedural history, the Court's determinations concerning credi-

bility of the witnesses, and the Court's Findings of Fact and Conclusions of Law under Rule 52 of the Federal Rules of Civil Procedure.

## I. PROCEDURAL HISTORY

On November 11, 1995, the plaintiff Brent Lawson ("Plaintiff" or "Mr. Lawson") filed this lawsuit alleging that Defendants Dallas County, Jim Bowles in his official capacity as Sheriff, and James Farris in his official capacity as Chief Medical Officer of the Dallas County Jail ("Defendants") were liable under 42 U.S.C. § 1983 because their policies, procedures, customs, and practices of being deliberately indifferent to Lawson's medical needs, not only caused him to develop serious and debilitating ulcers, but also prevented Mr. Lawson from receiving proper treatment of those decubitus ulcers. Lawson also claimed that Defendants were liable under the Texas Tort Claims Act for medical negligence. He sought to recover damages for pain and suffering and mental anguish. Additionally, Plaintiff requested an award of punitive damages.

This Court appointed, as counsel for Brent Lawson the law students of the SMU Law Clinic, who were supervised by Professor Maureen Noble Armour and assisted by Adam G. Schachter-both esteemed members of the bar of this Court.[1] On April 3, 1997, both the Plaintiff and the Defendants filed cross-motions for summary judgment.[2] After hearing oral argument from the parties, this Court issued a Memorandum Opinion on March 24, 1998,[3] finding that there was a dispute of material facts regarding "the extent of the jail

personnel's knowledge regarding Plaintiff's medical condition, as well as a dispute about the reasonableness of the jail's response to Plaintiff's medical needs." *Lawson v. Dallas County*, 1998 WL 246642, at *10 (N.D.Tex. Mar. 24, 1998). The Court also concluded that medical and expert testimony appeared necessary to determine the validity of the plaintiff's liability and damage claims. *Id.* at *17. However, the Court also found that Mr. Lawson was not entitled to recover punitive damages on his claims brought under section 1983 and the Texas Tort Claims Act. *Id.* at *18.

From November 2 through November 6, 1998, this Court conducted a bench trial in the courtroom at Southern Methodist University School of Law. At trial, the Plaintiff limited his claims to the section 1983 action—alleging that Defendants maintained a policy, procedure, custom, and practice of being deliberately indifferent to Mr. Lawson's medical needs, causing him to develop decubitus ulcers and preventing proper treatment of those ulcers. During trial, the Plaintiff requested an award of damages of $1,000,000.00 to compensate him for his past and future pain and suffering and his past and future mental anguish.[4]

## II. CREDIBILITY OF WITNESSES

These are the Court's credibility determinations concerning the witnesses who testified at the non-jury trial in this case.

1. *Brent Lawson:* The Plaintiff was a very credible witness in testifying about his experiences and treatment at the Dallas County Lew

---

1. This Court's Miscellaneous Order No.47 (filed October 27, 1993) sets the criteria for law students and unlicensed law graduates to practice in the Northern District of Texas under the supervision of licensed attorneys.

2. The SMU law students who worked on Mr. Lawson's case from 1995 to 1998—and who were involved in the summary judgment motions and the trial—were Adam Schachter, Marcie Flores, Ashley Warren, Martha Lee Bean, Stephanie Newkirk, Rodney Cooper, Daniel Madden, Jodie Ousley, Brent Berkley,

Beverly Leonard, Phong Phan, Kelly Perry, Andrea Sheinbein, Carla Dabbs, Kevin Poteere, and Kenetra Malone.

3. Oral argument was heard on November 11, 1997.

4. Mr. Lawson did not seek compensation for his past and present medical care because he is a recipient of Medicare, which paid all his medical expenses.

Sterrett Justice Center ("Lew Sterrett" or the "Dallas County Jail") about the lack of treatment and medical care that caused his serious injuries, and about his pain, suffering and mental anguish.

2. *Chris Hall:* Ms. Hall, a registered nurse, has extensive training and experience with chronic wounds and was certified as an expert regarding the treatment of paraplegia, the treatment and prevention of decubitus ulcers, and the proper supervision of nurses and nurses aides. She testified credibly about her experiences in treating Mr. Lawson at Lew Sterrett, the prevention and treatment of decubitus ulcers, and the equipment paraplegics need to take care of themselves. Ms. Hall was a very credible witness, with first-hand knowledge of Mr. Lawson's condition and treatment at the jail.

3. *T.L. Baker:* Mr. Baker, the head of Operational Support Services at a jail in Gulfport, Mississippi, was certified as an expert on jail standards. He was a very credible witness about jail standards and when variances from those standards should be permitted.

4. *Dr Kenneth Arfa:* Dr. Arfa, a psychiatrist at Lew Sterrett, testified regarding his jail interviews with Mr. Lawson. However, Dr. Arfa could not remember many specific details about these interviews, so the value of his testimony was minimal.

5. *Dr. Frank Lewis:* Dr. Lewis, a psychologist, served as a mental health consultant to the Dallas County Health Department; he also had a degree in vocational rehabilitation. Dr. Lewis only saw Brent Lawson one time, on November 9, 1993 and never reviewed Lawson's medical records. Because of his limited contact with Brent Lawson, the testimony of Dr. Lewis was of little value.[5]

6. *Diane Day (Lynn):.* Ms. Lynn, an LVN Supervisor at Lew Sterrett, testified regarding Mr. Lawson's intake at the jail, his medical problems while incarcerated, and jail medical procedures. However, since Ms. Lynn testified that she did not remember Mr. Lawson from the jail, any value and credibility of her testimony was greatly reduced.

7. *Carol Potter:* Ms. Potter, a nurse at Lew Sterrett, only remembered Mr. Lawson somewhat, and this limited any value of her testimony.

8. *Pat McCormack:* Ms. McCormack, the nursing supervisor at Lew Sterrett, was knowledgeable about nursing procedures there. She testified credibly about how she did not want to accept Mr. Lawson into the jail because of his serious medical conditions—and because they could not properly care for his decubitus ulcers.

9. *Bob Knowles:* Mr. Knowles is a Chief Deputy Sheriff of Dallas County. He testified regarding jail safety regulations. Mr. Knowles was credible, but he had no direct knowledge of Mr. Lawson or his situation.

10. The testimony of these witnesses is credited to the extent it is consistent with the following findings of fact.

## III. FINDINGS OF FACT

### A. *Background*

#### 1. *The Plaintiff's Condition As A Paraplegic*

The Plaintiff, Brent Lawson, was incarcerated in the Lew Sterrett Justice Center

---

**5.** Although he knew that Mr. Lawson did not have access to a pull-up bar to prevent further deterioration of his serious medical problem, Dr. Lewis' sole notation concerning the plaintiff was "Encourage inmate to do what he could to help himself."

from September 29, 1993 until November 28, 1993, pending a parole revocation hearing.

Brent Lawson has been a paraplegic since November 22, 1991, as the result of a gunshot wound which partially severed his spinal cord between the third and fourth thoracic vertebrae. Mr. Lawson is paralyzed below this "T3–T4" level. He is severely limited in his range of motion, being unable to turn around or see behind him. He has normal use of his right arm, but only limited use of his left arm and hand. Mr. Lawson has no control over his waist, back, stomach, legs, and hips, and he has some difficulty breathing. He is also a "double incontinent"—that is, he has no control over his bladder or his bowels; this requires him to wear an "adult diaper" at all times.[6]

Mr. Lawson cannot feel pressure or contact to his skin below the chest level except in very limited areas in his lower back and thighs. If his skin below his chest is damaged, he cannot feel injuries when they occur. This requires him to be hyper-vigilant about possible damage to or bruising of his skin. As a result of his paralysis, Mr. Lawson also experiences uncontrollable spasms of his leg muscles-which he can suppress, but not prevent, through the use of prescription medications.

Mr. Lawson is unable to dress himself, bathe himself, change his own diaper, monitor his own condition, feel or inspect his skin, or move properly without personal assistance or mobility aids. He qualifies for the maximum federal disability assistance available, Medicare TILE 3, to pay for the twenty-four hour skilled nursing care he requires as a paraplegic.

Mr. Lawson's paraplegia is now—and was during his confinement at Lew Sterrett—a serious medical condition that could cause many serious, systemic complications—including (i) total incontinence; (ii) poor circulation, which exacerbates the threat of blood clots and gangrene; (iii) muscle spasms; (iv) loss of sensation; (v) chronic depression; (vi) contractures; (vii) leg amputation; and—*most importantly for purposes of this case*-(viii) *decubitus ulcers.*

### 2. *Decubitus Ulcers: A Potentially Life–Threatening Condition*

Decubitus ulcers are caused by unrelieved pressure on the body—which damages the underlying tissue. These ulcers usually develop over bony areas and they can develop very quickly, in two hours or less. Factors contributing to the formation of decubitus ulcers include poor nutrition, poor hydration, depression, pressure on bony prominences, incontinence, and friction and shearing forces against the skin. *Patients who are fecally incontinent are twenty-two times more likely to develop decubitus ulcers.* (Pl.Ex. 119.)

There are four stages of decubitus ulcers:

(a) *Stage I decubitus ulcers* are characterized by "hot spots." In persons with black skin (like the plaintiff), these hot spots are typically a gray, ashy color. Treatment for a Stage I decubitus ulcer is simple, requiring only proper turning to alleviate pressure on the spot.

(b) *Stage II decubitus ulcers* are characterized by an actual break in the outer layers of the skin—where the tissue will begin to rot and die. Once the ulcer has breached the infection barrier of the skin and exposes the underlying tissue, there is a need for *immediate medical attention* with wet-to-dry dressing changes—i.e., wet dressings that are applied and packed into the decubitus ulcer and allowed to dry. Then, when the dressing is removed, the

---

**6.** During trial, Mr. Lawson was in a wheelchair, attended by a personal nurse. Because of his incontinence and inability to sit for long periods of time, frequent breaks were necessary during the four-day trial.

dead tissue is extracted with it—leaving the fresh, open surface highly susceptible to infection.

(c) *Stage III decubitus ulcers* are characterized by necrotic tissue that has penetrated through the skin and into underlying fatty tissue. *Proper treatment of Stage II and Stage III decubitus ulcers* includes the following: (i) turning of the patient and the use of pillows to relieve pressure and minimize the shearing forces; (ii) debridement of the wounds; (iii) cleaning the wounds of fecal material; (iv) maintaining wet-to-dry dressings; (v) providing adequate nutrition and hydration; (vi) using pressure reduction devices; and (vii) careful monitoring and documenting of the progression and treatment of the ulcers.

(d) *Stage IV decubitus ulcers* are characterized by full thickness skin loss with extensive destruction of muscle, bone, and/or supporting structures. *Stage IV decubitus ulcers are very serious medical conditions* because they result in bone, muscle, and tendon exposure. Once the decubitus ulcer has reached Stage IV, the wounds will not heal on their own; surgery is required to close them. (Pl.Ex. 118.) *Flap surgery* is one type of surgery used to treat Stage IV decubitus ulcers. It involves removing muscle from the surrounding area or thighs and relocating it into the cavity formed by the ulcer. Flap surgery is a serious and intrusive procedure that can result in substantial pain and discomfort. *Decubitus ulcers, if allowed to progress past their early stages, are a potentially life-threatening condition for paraplegics, like the Plaintiff Brent Lawson.*

### 3. *The Preventive Treatment Brent Lawson Should Have Received*

Decubitus ulcers are preventable with early intervention. Methods to prevent decubitus ulcers are well established and are part of basic medical training for Licensed Vocational Nurses (LVNs), Registered Nurses (RNs), and Medical Doctors (MDs). It is standard medical procedure that a paraplegic patient must be immediately assessed for the following:

(a) risk factors that can lead to the development of decubitus ulcers;

(b) mobility and the ability to provide self-care; and

(c) the amount of rehabilitation education the patient has received.

The proper prevention of decubitus ulcers includes the use of the following equipment and mobility aids:

(a) A *specialized pressure reduction mattress*—such as an egg crate, or water mattress—is essential to distribute the patient's weight over the entire length of the body to reduce pressure over bony prominences.

(b) *Pressure reduction pads* for wheelchair seats.

(c) *A mobility aid* like a trapeze suspended over a bed to be used by the patient to lift the body and reposition himself.[7]

(d) *A slide board*—that is, a mobility aid which assists the patient in transferring from one location to another, such as moving from a bed to a wheelchair.

(e) *Bed rails*—which are mobility aids that help secure transfers, assist in repositioning, and prevent falls.

The proper prevention of decubitus ulcers also includes *the following personal assistance* for the paraplegic:

(a) *Turning:* The proper turning of the paraplegic, which relieves pressure

---

7. It is extremely difficult—and sometimes impossible—for a paraplegic with limited use of abdominal and back muscles to move from a prone position to an upright position without the help of a trapeze.

on the "hot spots" and bony prominences, is essential to prevent skin damage due to friction[8] and shearing[9] forces—which pull at the necrotic tissue and at any dressings. The patient should be turned every two hours. This involves the placement of pillows and foam wedges for padding of the hip and coccyx bones. When a decubitus ulcer has already formed, improper turning can exacerbate the wound by restricting blood flow, damaging newly healed tissues, and forcing foreign materials deeper into the wound and causing serious infections.

(b) *Proper skin care:* The paraplegic's skin must be kept clean and dry, thus minimizing skin exposure to moisture due to incontinence, perspiration, or wound drainage. Proper skin care also includes providing the patient with lubricants that reduce the effect of shearing forces on the skin.

(c) *Proper hygiene:* The patient must be kept clean, dry, and free of offensive odors. Fecal material can contaminate ulcers and cause infections. It is essential that a double incontinent paraplegic—who cannot control his bladder or his bowels—receive prompt assistance to remain clean of feces and urine. The lack of proper hygiene contributes to skin erosion, infection of an open decubitus ulcer, and the development of complications such as "osteomyelitis"[10] and "sepsis."[11]

(d) *Proper nutrition:* Because nutritional deficiencies predispose patients to wound infections, wound dehiscence, sepsis and other complications nutritional assessments should be done periodically by health care providers in order to recognize early signs of malnutrition.

(e) *Assessment and documentation:* It is critical that the condition of the decubitus ulcers—i.e., the progress of the treatments and the regression or progression of the ulcers—be assessed and documented. Indeed, *failure to document the drainage and condition of the areas around the wound is blatant indifference to the improvement or worsening of the ulcers and to the patients' well-being.* If a decubitus ulcer is denigrating—a fact that is easily ascertainable by examining the size, depth, and internal condition of the wound—then it is clear notice to the medical staff that the current treatment is not adequate, and that more active or different treatments are needed to stop further deterioration of the wounds.

*It is reasonably foreseeable that, with the absence of proper turning, monitoring, hygiene, and dressing changes, a paraple-*

8. *Friction injuries* occur when the skin moves across coarse surfaces, such as bed linens. They commonly occur in patients who are not able to lift themselves sufficiently for repositioning. This methodical wearing away of surface tissue increases the potential for deeper tissue damage. Patients who have uncontrollable spasmodic movements are at high risk for tissue damage caused by friction. (Pl. Ex. 119.)

9. *Shearing injury* occurs when the skin remains stationary and the underlying tissue shifts, resulting in pinched or blocked blood vessels. This diminishes the blood supply to the skin and can cause severe tissue damage.

10. *Osteomyelitis* is a serious infection of the bone that delays the healing of decubitus ulcers, causes extensive tissue damage, and even death. Osteomyelitis is also painful, even in paraplegics who have limited skin sensation. It is extremely difficult to treat and may not ever be cured. It may require amputation of the affected bones. (Pl.Ex. 119.)

11. *Sepsis* is a systemic blood infection in which pathogens and poisonous products infect the blood stream. It can rapidly lead to the patient's death. Treatment for sepsis includes high levels of intravenous antibiotics over a protracted period of time.

gic—like Brent Lawson—*will rapidly develop decubitus ulcers. It was also reasonably foreseeable that, with the absence of adequate mobility devices—including bed rails, a trapeze, a slide board, and a pressure reduction mattress—these decubitus ulcers would quickly progress to Stage IV, a potentially life-threatening condition.*

### B. *Mr. Lawson's Treatment Prior to His September 1993 Incarceration at Lew Sterrett*

After he became a paraplegic in November of 1991, Brent Lawson received *two months of rehabilitation training at Parkland Hospital* in Dallas, Texas. The training included instructions in the use of various pieces of equipment—such as the wheelchair, trapeze, and a slide board—as well as directions in exercises to alleviate nerve and muscle damage and in moving from the bed to a wheelchair and back. At Parkland Hospital, Brent Lawson was also provided with various pieces of equipment—including an adjustable bed with rails on both sides, padded sides, a cushion on top of the mattress, and an adjustable trapeze suspended above the bed—which would lessen the risk that he would develop decubitus ulcers and allow Mr. Lawson to care for himself.

After his discharge from Parkland Hospital, *Brent Lawson resided at Brentwood Nursing Center for more than a year.* At Brentwood, he received assistance with daily life activities, including turning in bed, personal hygiene, bathing and dressing, and transferring from his bed to his wheelchair. He was routinely monitored for the development of "hot spots" and was given assistance with "range of motion" exercises to help him avoid contractions in his knees and legs. Brentwood also provided Mr. Lawson with mobility equipment—including a wheelchair with low arms, a trapeze, a slide board, and a hospital bed with bed rails and a pressure reduction mattress. He had access to a shower with a proper shower chair.

Brent Lawson did not develop decubitus ulcers on his lumbosacral or buttock areas while at Brentwood. However, he did develop decubitus ulcers on his feet from wearing improper shoes, and this resulted in *his transfer to Tri–City Hospital in September 1993.*

At Tri–City, Brent Lawson was again provided with mobility equipment that included a wheelchair, a trapeze, and a hospital bed with bed, a pressure reduction mattress, and a slide board. He also had access to a shower with a proper shower chair. At Tri–City, Mr. Lawson received the skilled nursing care and assistance which he needed to prevent the development of additional decubitus ulcers—including an initial risk assessment, daily skin inspection, routine cleaning at the time of soiling, and minimal skin exposure to moisture caused by incontinence, perspiration, or wound drainage. His care at Tri–City also entailed use of proper positioning, transferring, and turning techniques to minimize shearing and friction injury. He was repositioned every two hours to avoid hot spots. The treatment of the decubitus ulcers on Mr. Lawson's feet at Tri–City also included antibiotics, whirlpool treatment, surgical debridement,[12] and cleaning of his wounds. *Tri–City Hospital records reflect that these ulcers were successfully treated—i.e., they were healing and new, healthy tissue was forming*

However, on September 13, 1993, while he was being treated at Tri–City Hospital, Mr. Lawson was arrested for parole violation. The Dallas County Jail did allow Brent Lawson to remain at Tri–City for ten days after his arrest, until his condi-

---

**12.** *Surgical debridement* involves the use of a scalpel, scissors, or other sharp instrument to remove dead tissue. This method is the most rapid form of debridement and may be the most appropriate technique for removing ar- eas of thick, adherent eschar and dead tissue in extensive ulcers (Pl.Ex. 118.) After a surgical debridement, dressing changes and constant monitoring are essential.

tion was stable and he no longer needed intravenous antibiotics to treat the decubitus ulcers on his feet.

### C. *Mr. Lawson's Treatment at the Dallas County Jail; September 23—October 31, 1993*

On September 23, 1993, Brent Lawson was transferred to the Lew Sterrett Justice Center to be held pending his parole revocation hearing. When Mr. Lawson left the Tri–City Hospital and entered the Dallas County Jail, his skin was in good condition, and he was well-nourished and well-hydrated. He had a Foley catheter, and there were no sores on his buttocks or hips. He was wearing a hospital gown, socks, and an adult diaper.

In order to protect Brent Lawson from developing decubitus ulcers during his stay at the Dallas County Jail, *Dr. Michael Benavides*—Mr. Lawson's doctor at Tri–City—*specifically stated on the hospital patient transfer form that Brent Lawson required "range of motion" exercises for his legs twice a day, and that his body position should be turned once an hour.* And, for the treatment of the ulcers on Mr. Lawson's feet, Dr. Benavides prescribed several medications and ordered *dressing changes twice per day and a daily whirlpool treatment.* In addition, Dr. Benavides ordered that Mr. Lawson's catheter be changed once every thirty days and that he receive frequent diaper changes and assistance with cleaning himself. Most significantly, Dr. Benavides's discharge summary concerning Brent Lawson states:

> The duration of his hospitalization [at Tri–City] was extended due to the fact that *we could not get verbal assurances from the medical staff at Lew Sterrett Jail that the patient would continue to be able to receive IV antibiotics ... and daily whirlpool treatments and dressings to his feet,* due to the fact that they do not have those types of facilities. *They stated that there was no assurance that upon his arrival to Sterrett that he*

> *would be evaluated in a timely manner and subsequently transferred to Parkland....*

> *Dr. Farris, who is the medical director at Lew Sterrett, was made aware of the patient's condition.* We also informed his attorneys of his condition and the level of care that he would require. *It is doubtful in a penitentiary system that the patient would be able to continue to receive the level of care that he needed,* however, his infections had become clean. His wounds were clear and we had no compelling reason to continue his hospitalization at Tri–City Hospital. Therefore he was subsequently dismissed on 9/23/93 with transfer orders and medical care orders accompanying him.

> *His prognosis is guarded* due to the fact he may be facing additional jail time and the fact that he's a paraplegic. *It is felt that these decubiti will continue to breakdown and become secondarily infected.* Therefore, *we anticipate future hospitalizations on this patient.*

(Pl.Ex. 73.) (Emphasis added.)

### *Mr. Lawson Goes Through Intake*

Nurse Pat McCormack, who was the supervising nurse when Brent Lawson came through intake at the Dallas County Jail, was concerned about his admission because he was coming from a hospital setting. Indeed, prior to intake, *she objected to Mr. Lawson's detention at Lew Sterrett and fought against accepting him because she knew that the jail could not adequately care for him* based on his medical records and medical needs.

Although Nurse McCormack attempted to refuse admission to Mr. Lawson because he could not receive adequate medical care, the Sheriff's Department overruled her decision. Moreover, although it was clear from the Tri–City transfer orders that Mr. Lawson required skilled nursing care, he was not required to see—*nor did he ever see*—a physician at the time of intake.

During intake, Nurse Diane Lynn—the nurse on duty who admitted Mr. Lawson—clearly noted in Lawson's jail records that *she could not read the medical transfer order* from Tri–City Hospital. Following jail policy, procedure, and practice, Nurse Lynn *did not* contact Tri–City to clarify the medical transfer orders—*despite the fact that it is standard nursing procedure to do so.* The result was that the Tri–City medical orders were not properly transferred into Mr. Lawson's jail medical records. Indeed, *his records do not even indicate that his position needed to be changed every hour, that he had no weight bearing ability, or that his Foley catheter was to be changed every thirty days.* (Pl. Ex. 54.) Nurse Lynn did note that the doctor was to later evaluate Mr. Lawson.

There were alternative placements available to the Dallas County Jail for a paraplegic like Mr. Lawson—including (i) an appeal to the State for transfer (with supervision) to a facility like Brentwood Nursing Home, (ii) the use of a local hospital facility with limited security, like Parkland Hospital, or (iii) the transfer of Brent Lawson to the Texas Department of Corrections ("TDC") after an expedited parole revocation hearing. However, as a matter of policy, procedure, and practice, none of these alternatives were even considered by the jail.

The Dallas County Sheriff's Department was fully aware that the Texas Commission on Jail Standards required the jail to "provide medical ... services in accordance with the approved health services plan." (Pl.Ex. 128: Ch. 273.1.) This written plan must, *inter alia,* "provide procedures for long-term, convalescent, and care necessary for disabled inmates." (*Id.;* Ch. 273.2(4).) The Sheriff's Department also knew that the quality of the care provided must be consistent with the medical standards and procedures available in the community. *Chief Knowles was aware that*

*neither he nor the medical personnel* to whom he delegated responsibility for medical care *in the Dallas County Jail had ever evaluated or reviewed the care provided to paraplegics to determine if it complied with community standards.*

It is standard medical practice to assess a paraplegic's arm mobility to determine the degree to which he can care for himself. However, *during Mr. Lawson's intake,* the jail medical staff did not determine the degree to which he could care for himself or move himself without assistance. The policy, practice, and procedure of the jail was not to assess whether an incoming paraplegic had any rehabilitation training and not to determine arm strength, neck strength, or mobility.

### Mr. Lawson's Assignment to an Infirmary Cell

At Lew Sterrett, Brent Lawson was assigned to an infirmary cell (or "medical tank") equipped with about sixteen beds, three or four tables, a shower, two sinks, two toilets, some mats on the floor, and a call button. The beds were concrete slabs overlaid with ceramic tile.[13] The bunk was padded only with a standard issue mattress—a three-inch thick pad that was wholly inadequate to prevent a paraplegic from developing decubitus ulcers. The mattress was not secured to the tile, and it would slide around as Mr. Lawson dragged his body across the bed. *Indeed, on multiple occasions, the pad shifted and Brent Lawson slid onto the floor with the pad.* Also on multiple occasions, Mr. Lawson fell onto the floor while attempting to transfer from his bed to his wheelchair—*and was left to lie there until he was helped by another inmate.*

The lack of support provided by the jail's beds and the lack of cushioning in the wheelchair substantially increased the likelihood that Mr. Lawson would develop hot spots and decubitus ulcers, as well as be

---

**13.** There was one medical tank at Lew Sterrett which did have hospital-style beds; however, Brent Lawson was not considered appropriate for this cell solely because he was paraplegic.

vulnerable to friction, shearing, and abrading of the skin.[14]

### Mr. Lawson's Transfers from Bed to Wheelchair

For Brent Lawson to transfer from his bed to his wheelchair in the infirmary cell was a physically exhausting challenge. First, he had to heave his prone, paralyzed body to a half-sitting position, using only his arms and the smooth half-wall to drag the lower half of his body to the edge of the bed. Then, he then had to reach out to his wheelchair with one arm and pull the wheelchair as close as possible to the side of the bed so he could set the brake and remove the arm of the chair. Once the wheelchair was in place, Mr. Lawson had to hoist the weight of his body out over the edge of the bed, up over the wheel and side of the chair, and then down into the seat. All of this required him to lift his body weight using only his arms, one of which has only limited strength.

It was even more difficult for Brent Lawson to transfer from the wheelchair to the bed. From a seated position, he had to position the chair close to the side of the bed, fix the brake, and remove the arm of his chair. Then, using only his arm strength, Mr. Lawson had to lunge out of the chair and propel his body as far as he could, while trying to reach for the half-wall with his arm. The half-wall was the only handhold he could grab for when transferring to the bed.

Brent Lawson's bed-wheelchair transfers were also impeded by the catheter bag and tubes—which were attached to his wheelchair, and which had to be moved and replaced as he transferred. Because the catheter bag was suspended from a hook under the seat of his wheelchair, the placement and removal of the bag were awkward and difficult, and this further complicated his transfers. In addition, on many occasions, Mr. Lawson and/or his wheelchair were soiled with urine, feces, or blood, making any attempted movement even more difficult. Furthermore, Brent Lawson's already-difficult transfers were often complicated by the occurrence of muscle spasms in his legs, for which he was taking prescribed medication. The unpredictable spasms made it extremely difficult for Mr. Lawson to transfer himself, even with supervision and mobility aids. In the jail—where he had none of this assistance—transfers were exhausting and frightening. Indeed, it was the jail's custom and practice for paraplegics to depend on the help of other inmates for turning, getting into and out of bed, and transferring to and from a wheelchair.

### Lack of Mobility Equipment and Nursing Assistance

Brent Lawson was refused the necessary mobility equipment to enable him to help himself, and he was also refused personal nursing assistance with getting into and out of bed, turning in bed, showering, and changing his soiled diapers—all of which was standard care provided to paraplegics in the medical community. Mr. Lawson experienced continuous and severe mental anguish as a result of his unanswered requests for assistance with daily activities and from the jail's refusal to give him any of the mobility equipment he required—such as pressure-reduction mattress, a bed with rails, a trapeze, a slide board, a shower chair, and a special wheelchair.

### Mr. Lawson's Grievance

During the night of October 2, 1993, Brent Lawson fell out of his bed. He was unable to maneuver himself back on the bed, so he called the officer on duty for assistance. That officer refused to send anyone to help Mr. Lawson and deliberate-

---

14. No current or former Dallas County Jail employees who testified at trial could recall any other inmate who developed decubitus ulcers while at Lew Sterrett; *however, most of these employees also could not even recall Mr. Lawson—who, of course, did develop these ulcers because of lack of proper treatment and equipment*

ly left him lying on the floor—where he *remained for the rest of the night.* Much later, the morning shift officer found Mr. Lawson on the floor and helped him back into bed. (Pl.Ex. 152.)

On October 2, 1993, Brent Lawson filed a grievance concerning this incident; two of the other prisoners in the infirmary cell who witnessed this occurrence signed his grievance form. On October 8 the Lew Sterrett Tower Division received the grievance, and on October 14, the jail's response was issued. It simply stated that no one assisted Mr. Lawson *because Nurse Sampson had informed the officers on duty that Lawson "was able to move himself because he had use of his arms."* That response concluded: "It is not common procedure for officers to routinely assist inmates from their bunks to their wheelchairs or from their chairs to their bunks. Generally inmates assist each other in these situations." The supervisor who reviewed the response noted that the "officers were correct and professional in the performance of their duties in this case." (Pl.Ex. 152.) The medical staff at the jail was not sent a copy of Brent Lawson's grievance, or the response, despite the fact that medical concerns were clearly raised by this grievance.

### The Problems With Mr. Lawson's Medications

On October 26, 1993, one month after Brent Lawson was booked into Lew Sterrett, the jail psychiatrist, Dr. Arfa, met with Mr. Lawson because he had been prescribed Elavil. During that meeting, Lawson complained that he was not getting Valium to control muscle spasms. Dr. Arfa determined that Brent Lawson did not have a psychological problem and was not abusing drugs. He noted in the medical records that the Elavil prescription was for a medical—not psychological—problem and that the medical staff should follow up on Mr. Lawson's medications.

Brent Lawson sometimes missed receiving his prescribed medications because his paralyzed condition prevented him from moving quickly enough. After the daily announcement that it was time for medication to be distributed, Mr. Lawson, of course, had to move from the bed to his wheelchair, and then make his way to the *door of the tank* to receive his prescribed medications. If he could not make it to the cell door in time, or if he fell trying to transfer, then he did not receive the medications he needed—*even though the duty officers knew that Lawson required daily medications.*

### Dressing Changes, Showers, Bowel Movements

When the announcement was made for dressing changes, Lawson again had to do the best he could to transfer from the bed into his wheelchair without any assistance. At the time of the dressing changes, he could also elect to receive a suppository, go to the bathroom to use the toilet, and have a shower. However, Mr. Lawson often had to choose either between having his dressings changed or going to the toilet and shower—because by the time he finished cleaning himself and returned to the nurse station, it was too late for his dressings to be changed. On some occasions, Mr. Lawson chose to go to the shower to try to clean himself, only to miss the opportunity to have staff change his bandages—which were then wet and dirty from the shower.

The shower to which Brent Lawson had access from his wheelchair to the chair was equipped only with a small plastic chair without arms; this made it very difficult for him to transfer from his wheelchair to the chair. Mr. Lawson had to wheel up a ramp into the shower and then attempt to transfer his body weight into the lightweight plastic chair. Then he had to try to get the wheelchair into position next to the shower chair, fix the brake, and remove the arm. Next, he had to lift his body weight-using only his arms-out of the chair, over the wheel, and into the lightweight plastic chair that offered little or no

stability for the transfer. Unlike a standard shower chair, which provides an opening for the buttocks region, the jail's plastic chair had no opening. Thus, there was no place for the water running off Mr. Lawson's body to drain, and he was forced to sit in a pool of dirty shower water. On one or more occasions, Brent Lawson fell in the shower and had to lie on the filthy shower floor until help arrived. It was the jail's policy, procedure, and practice that officers could not offer any prisoner assistance in the shower, even paraplegics like Mr. Lawson.

Brent Lawson can only control the timing of a bowel movement through the use of rectal suppositories. If a suppository is inserted, then he can have a bowel movement. On some occasions, jail personnel failed to insert the suppository correctly—and Mr. Lawson later found it in his chair. Without the suppository, he was unable to control either the timing or occurrence of his bowel movements—and he would have bowel movements at any time, in his bed or in his wheelchair.

When Brent Lawson had bowel movements in his bed or in his chair, he was soiled with feces-but he had to wait until the next dressing call to be cleaned up. If he was in bed, Mr. Lawson had to transfer himself, now dirty with feces, to his wheelchair and then remove the linens from the bed and replace them with clean bedding. *Often, Mr. Lawson lay for several hours in his own feces.*

While he was incarcerated at the Dallas County Jail, Brent Lawson suffered continuous humiliation, embarrassment, and indignity as a result of lying in feces on his bed in front of other inmates in his tank, sitting in feces in his wheelchair in the presence of inmates, being forced to depend on other inmates for any personal assistance he needed, being left on the shower floor, and being left to sleep on the prison floor when guards refused to help him.

### D. *The Lew Sterrett Medical Staff First Notices Decubitus Ulcers on Mr. Lawson After Four Weeks*

On November 3, 1993, only four weeks after his admission to the Dallas County Jail, *Brent Lawson was finally seen by Dr. John Kimmons.* He diagnosed pressure breakdowns on Mr. Lawson's lower back that had already progressed to Stage II— a break in the outer skin layers which requires immediate attention because the tissue has begun to tot and die. This was the first notation in Mr. Lawson's medical records of decubitus ulcers, even though the nurses claim—*although not credibly*— that they would have noted any new wound in Mr. Lawson's charts because they "check inmates from head to toe at routine dressing changes." Dr. Kimmons ordered the jail nursing staff to give Mr. Lawson wet-to-dry dressing changes three times a day.

However, *despite these express orders by Dr. Kimmons,* Brent Lawson did not receive the wet-to-dry dressing changes *three times a day* because the policy, procedure, and practice of the jail medical staff was to perform dressing changes only *twice a day.* In fact, the nursing staff did not ever write a dressing card reflecting Dr. Kimmons's orders; instead, the dressing card created after Dr. Kimmons's examination incorrectly stated that Mr. Lawson should receive the wet-to-dry dressings only *once per day.*

On one or more occasions, the jail nursing staff also dressed Brent Lawson's ulcers in gauze bandages that were easily dislodged when Mr. Lawson dragged his hips over the side of his wheelchair as he was transferring to his bed without personal assistance or a slide board or any other mechanical mobility aid.

### E. *November 6, 1993: Mr. Lawson is Transferred to a Single Cell*

On November 6, 1993, Nurse Lynn did note in Brent Lawson's medical records that he had feces in his wheelchair and on his clothes and that she had sent him to

the "handicap shower" to clean himself. (Pl.Ex. 58.) However, Nurse Lynn did not even ask Mr. Lawson if he needed help because *she merely assumed that he had deliberately smeared himself with his own feces.* And, she noted in Mr. Lawson's chart that he had "poor hygiene" and that he "will not clean himself." Because Brent Lawson was filthy and had began to smell of feces and urine, he began to be shunned by the other inmates—upon whom he had been relying for help. Without the inmates' assistance, Mr. Lawson had no one to help him. Then, on November 6, 1993, Nurse Lynn transferred Mr. Lawson from the infirmary tank to a single cell for the remainder of his stay at the Dallas County Jail—allegedly because other inmates were complaining that Mr. Lawson smelled of urine and feces.

After Brent Lawson was moved to a solitary cell, caring for himself became even more difficult. In this single cell, Mr. Lawson had no hand hold at all because the bed was built into a full wall, rather than a half wall as in the medical tank. This made it virtually impossible for Mr. Lawson to get into his wheelchair from the bed. *Occasionally,* the jail staff did help him out of the bed for dressing changes or meals. However, several times while Brent Lawson was in the single cell, he fell onto the floor while trying to transfer and he lay there for extended periods of time. On one or more occasions when Mr. Lawson summoned help because he had fallen onto the floor, an officer did come to the door of his cell—*but refused to help him get up.*

Although the jail medical staff were now aware of the pressure sores on Brent Lawson's back and buttocks, the jail continued to refuse to provide him with the things necessary for his care—that is, a pressure-reduction mattress or cushion, bars for assistance in turning and changing position, and assistance with personal hygiene. Restricted by jail policy, practice, and procedure, the medical staff would merely administer medications to Mr. Lawson and change his dressings—*but it was not permitted to do anything else to help him.*

Brent Lawson felt defeated and humiliated by the actions of the jail medical staff in leaving him to care for himself *when he could not do so* and by his inability to maintain personal hygiene. He testified that he felt like giving up and killing himself, rather than face another day of his ordeal.

**F. *The Decubitus Ulcers Worsen***

Jail medical records indicate that nurses saw Brent Lawson on November 3, 5, 6, and 8, 1993. On November 8, Dr. Kimmons diagnosed Mr. Lawson with large decubitus ulcers on his left hip and gluteal area—*but the jail nurses had not made a single notation about the progression of these ulcers in Mr. Lawson's medical records.* A November 8 entry notes that his ulcers have worsened by enlarging and *appear to be at Stage III,* at least. The Parkland medical records indicate that Brent Lawson's decubitus ulcers were at *Stage III and IV* when he was returned to the Dallas County Jail on November 12, 1993.

Although Dr. Kimmons ordered that Mr. Lawson be taken to Parkland Hospital for debridement, an appointment was not made for him to go to the Parkland surgery clinic until December 28—*some fifty days later.* Moreover, in the eight days following Brent Lawson's November 9th appointment with Dr. Kimmons, he did not receive a single dressing change at the jail. His dressing card states that he "refused dressing changes" on November 9, 10, 11, 13, and 15.[15] However, *these "refused dressing changes" entries are suspect, at best*-because the evidence established that an inmate who did not show up for a dressing change because he was physically unable to move himself from his bed to his wheelchair would have been shown to have

---

15. There is no dressing card entry for November 14.

"refused" a dressing change. (Defs'.Ex. 11–8, 18.)

On November 8, 1993, Brent Lawson was again referred to Dr. Arfa for a psychiatric consultation for "appearing to have given up on his self-care." *Dr. Arfa determined that Mr. Lawson had not given up on his self-care*, that he did not have a drug abuse problem, and that he did not have any psychological problems that would explain his hygiene. Although, Dr. Arfa ordered Mr. Lawson to counseling sessions to "counsel him to take better care of himself"—but he did not alert the medical staff of a possible medical care problem. (Pl.Ex. 51.)

Dr. Arfa referred Brent Lawson to Dr. Lewis, the jail psychologist, who saw Mr. Lawson on November 9, 1993. Dr. Lewis counseled Mr. Lawson to take better care of himself, and he ordered Mr. Lawson to come in the following week for more "supportive counseling." (Pl.Ex. 50.) The nurses' notes on November 12, 1993, again reflect Brent Lawson's inability to keep himself clean. The staff observes that he is having difficulty with hygiene, and Mr. Lawson tells them that he "cannot do it without bars." (Pl.Exs.55, 57.)

### G. *November 13, 1993: Mr. Lawson's First Visit to Parkland Hospital*

On November 12, 1993, the jail medical staff discovered that Brent Lawson had not voided in approximately twelve hours and that his bladder was distended. This warranted a visit to Parkland Hospital's Emergency Room for a urinary tract infection. At Parkland, *Mr. Lawson was diagnosed with Stage III and IV decubitus ulcers* on his back and hips. · (Pl.Exs.35, 55, 57, 58, 84–91.)

Brent Lawson was then returned to the Lew Sterrett jail with *"medically necessary orders"* directed to the jail nursing staff—including the administration of an oral antibiotic for ten days; wet-to-dry dressing changes three times a day for both feet, the sacrum, and the lesser and greater trochanters; turning every two hours; and providing him with a ROHO (a type of pressure-reducing mattress) or similar mattress to sleep on. These Parkland Hospital orders specified that Mr. Lawson "cannot" sleep on "concrete," and an egg-crate mattress was prescribed and furnished by Parkland until a ROHO could be obtained. (Pl.Exs.35, 36, 92.)

Despite these orders from Parkland Hospital, Dallas County jail personnel returned Brent Lawson to his single cell where he slept on the same mattress, received no assistance with repositioning or turning, was never provided "range of motion" exercises or whirlpool treatments, and received dressing changes only once a day. The jail continued to refuse to provide necessary care items such as a pressure reduction mattress or cushion, trapeze bars, or assistance with hygiene—*even though the diagnosis of the decubitus ulcers had been communicated to the staff.*

Brent Lawson's dressings were changed only twice a day—instead of three times a day—because the policy, practice, and procedure of the jail. Mr. Lawson did not receive a ROHO mattress because the jail's policy, practice, and procedure was not to allow them because, "if set on fire," they would create "a lot of smoke." Mr. Lawson was not turned every two hours because the policy, practice, and procedure of the jail was not to allow the medical staff into the tanks every two hours.

The growth and further development of the decubitus ulcers weakened Brent Lawson, and his mental and emotional states further deteriorated. Mr. Lawson was still trying to care for himself, but his sense of frustration was growing. Jail personnel continued to ignore the progressive worsening of the decubitus ulcers. He was scared and afraid as a result of his worsening physical condition. He was also aware of the Parkland Hospital orders for the care of his decubitus ulcers and was worried and frightened by the jail's refusal to follow Parkland's orders.

Pursuant to the jail's policy, procedure, and practice, the nurses never advised Parkland Hospital (or anyone else) that they could not follow the Parkland orders—nor did they attempt to find alternatives or ask for Mr Lawson's removal from Lew Sterrett, even though the jail infirmary was not able to meet his immediate medical needs.

### H. *November 19, 1993: Mr. Lawson's Second Visit to Parkland Hospital*

The decubitus ulcers on Brent Lawson's hips and buttocks rapidly worsened after Parkland Hospital sent him back to Lew Sterrett; and, on November 19, 1993, he was returned to Parkland for a wound check of the ulcers on his hips, buttocks, and both feet. (Pl.Ex. 43.) The medical staff at Parkland diagnosed Mr. Lawson with decubitus ulcers on his left hip and buttocks, as well as an abrasion on his right hip.

On November 19, 1993, Parkland returned Mr. Lawson to the Dallas County Jail with orders that he *must* continue taking his oral antibiotic until finished, *must* continue wet-to-dry dressing changes twice a day, and *must* continue hydrotherapy. Parkland also directed the jail that Brent Lawson must be turned every two hours while awake, and he must be provided with a foam mattress. (Pl.Ex. 43.) These November 19th Parkland orders for a special mattress, turning, and dressing changes *were not transferred to Mr. Lawson's jail medical records and, therefore, they were not followed by the jail.*

Brent Lawson was worried and frightened about his worsening condition, about the damage to his lower back and buttock region, and about *the jail's continued disregard of the Parkland doctor's orders.* By this time, his decubitus ulcers were *so large that Mr. Lawson could put his fist into the holes that were developing.* Nevertheless, jail personnel still refused to monitor his decubitus ulcers for changes in size or development of infection. As his ulcers worsened, Brent Lawson continued

to feel pain in his hips, and he was forced to endure the strong foul smell of his draining wound.

Incredibly, despite Mr. Lawson's worsened condition, *the jail nurses' notes do not reflect the progression of the decubitus ulcers.* Indeed, the Dallas County Jail do not contain *any notations* charting the progression of the ulcers until Brent Lawson was sent back to Parkland Hospital on November 28, 1993.

### I. *November 28, 1993: Mr. Lawson is Transferred for the Third Time to Parkland Hospital*

On November 28, 1993, a member of the jail medical staff ordered that Brent Lawson be sent to the Parkland Hospital Emergency Room because pus and blood were draining from the large decubitus ulcers on his back. At Parkland, Mr. Lawson was diagnosed with three large decubitus ulcers, *two of which were Stage IV, exposing dead tissue and bone with sepsis.* The hospital's admission notes state that Brent Lawson was "admitted for more appropriate medical management of huge, deep decubitus ulcers of the hip and buttock area and over both heels *which have been present for [approximately] two months"*—and that one of the ulcers was emitting a "foul smell." The admission notes also observe that, since Mr. Lawson's last visit to the Parkland emergency room on November 19, *his "decubiti have not been dressed and in jail, he has not been turned so he has pressure over the area causing progressive enlargement."* According to Mr. Lawson's discharge summary, the initial impression was that *"the patient has not been cared for properly in the interim."* (Pl.Ex. 92.)

On November 30, 1993, Brent Lawson's attending physician, Dr J. Donald Smiley, made the following entry in Mr. Lawson's records:

> This [patient] cannot be effectively treated as an outpatient in the County Jail. We should ask Social Service to

help us intervene here to get him where he can be more effectively turned off the decubitus ulcers [six to ten times per day]. He needs [physical therapy] and spinal cord management training which we could initiate while he is here awaiting Surgical intervention. (Pl.Ex. 92.)

During this stay at Parkland, Brent Lawson was treated with hydrotherapy to clean his wounds and he underwent multiple surgical debridements. Mr. Lawson was also put on a high protein and increased nutritional diet because he had received only 60% of his protein needs and only 81% of his caloric needs while at Lew Sterrett. (Pl.Ex. 92.) At Parkland, wound cultures indicated that Brent Lawson had an MRSA infection, caused by a bacteria that could result in serious problems. Because Mr. Lawson was often resistant to antibiotics, he was put on IV antibiotics that fed directly into his heart. (Pl.Ex. 92.)

By December 9, 1993, Brent Lawson's decubitus ulcers were slowly starting to heal. His attitude gradually changed from a flippant "I-don't-care" attitude to a much more sober assessment of his very serious problems—and Mr. Lawson showed considerable gratitude toward the people who were trying to help him. (Pl.Ex. 92.) Parkland Hospital provided Brent Lawson with a ROHO mattress and a trapeze, and the nursing staff noted that he was much better able to self-adjust his position after getting the trapeze. (Pl.Ex. 92.)

On December 17, 1993, the Parkland doctors discussed with Mr. Lawson the facts that his knees and hips had started developing contractures because he had not received any range of motion exercises during the fifty-nine days he was at Lew Sterrett-and, for these reasons, *they also discussed with Brent Lawson the possibility of amputating both of his legs where they joined his body.* (Pl.Ex. 92.) Each time Brent Lawson was seen at Parkland Hospital, he would complain that he was confined to a concrete floor and that no help was available for him to periodically clean himself. (Pl.Ex. 92.) Mr. Lawson suffered extreme physical pain and great discomfort from the side effects incident to the ulcers, including high fever, chills, and sweating. (Pl.Ex. 92.)

On this, his third trip to Parkland Hospital, *the Parkland doctors refused to release Brent Lawson back to Lew Sterrett because the jail could not effectively treat him.* Instead, a Parkland social worker arranged to have Mr. Lawson transferred to the custody of the Texas Department of Corrections. (Pl.Ex. 92.)

## J. Mr. Lawson is Transferred to the Texas Department of Corrections and John Sealy Smith Hospital in Galveston

On January 8, 1994, Brent Lawson was transferred to the custody of the Texas Department of Corrections (TDC), which immediately transported him by ambulance to John Sealy Hospital in Galveston ("John Sealy"). During the transfer, Mr. Lawson was feverish and he was experiencing nausea and night sweats. At John Sealy, he was diagnosed with three large sacral and bilateral trochanter decubitus ulcers with secondary bacterial infection. On January 20, at John Sealy Hospital, Brent Lawson again *underwent surgical debridement* for the removal of dead tissue from his decubitus ulcers. He was sent to John Sealy's Plastic Surgery Clinic on April 4, 1994 to determine if he was a candidate for flap repairs. (Pl.Ex. 124.)

Brent Lawson's medical records also indicate both the presence and the progression of osteomyelitis in the left trochanter-which had developed as a result of his decubitus ulcers. On May 3, 1994, because of continual bacterial infections and incomplete healing of the decubitus ulcers, Mr. Lawson *underwent another debridement* of the right trochanteric ulcer-an ostectomy of right trochanter bone-and flap surgery to close the right trochanter ulcer. Approximately five weeks later, on June 14, 1994, Brent Lawson underwent exci-

sion with ostectomy of the left trochanter and had another flap surgery. (Pl.Ex. 124.) Following his second flap surgery, Mr. Lawson's left flap broke down and developed a chronic sinus of the left trochanteric region. *He underwent a third surgery* on August 4, 1994, to excise and debride the left trochanter pressure sore to remedy infection and remove dead tissue. (Pl.Ex. 124.)

After each of these three surgeries, Brent Lawson was confined to his hospital bed; and, he had to lay in a prone position for weeks so that his new flaps would not be subjected to any pressure, friction, or shearing. Mr. Lawson suffered extreme mental anguish, physical and emotional distress, and pain and discomfort because of the multiple debridements, flap surgeries, biopsies, wound cultures, and limited mobility as a result of the extended confinement at John Sealy Hospital over a period of approximately 207 days. Brent Lawson also has extensive scarring and disfigurement on his lower back and buttocks from the flap surgeries.

While Brent Lawson was incarcerated at TDC–Huntsville and while he was treated at John Sealy, he was provided with a pressure reduction mattress, a bed with side rails, a trapeze, and a proper shower chair. Trustees also helped Mr. Lawson turn in his bed and transfer into and out of his wheelchair. TDC incurred $58,101.54 in hospital expenses, exclusive of doctors' costs, for Mr. Lawson's surgeries. John Sealy incurred $18,184.25 in hospital expenditures exclusive of doctor's costs.

Finally, on December 16, 1994,—after almost one year at John Sealy—Brent Lawson was released from the custody of TDC–Huntsville.

### K. *Mr. Lawson's Treatment at John Peter Smith Hospital at Fort Worth*

After Brent Lawson's release by TDC, he was transferred to John Peter Smith Hospital in Fort Worth, Texas—where Dr. Omey, an orthopedic surgeon with specialized training in dealing with persons with limited mobility, treated him for his ongoing problems with decubitus ulcers and osteomyelitis.

Brent Lawson was suffering from a drainage wound approximately one centimeter in diameter and three centimeters deep through his left flap. This wound was not a decubitus ulcer, but rather a fistula wound that was caused by the osteomyelitis. Mr. Lawson had to endure a strong, foul odor caused by green and yellow drainage from the fistula. Dr. Omey ordered whirlpool treatments to debride the wound and aid wound healing before doing any additional treatment.

On December 23, 1994, Brent Lawson underwent surgery for his osteomyelitis. The bone was cleaned out and washed and antibiotic beads—made of bone cement with antibiotic powder, which were placed on a strand of suture—were surgically implanted around the left trochanter, and then packed inside the wound, which was then tightly closed. Mr. Lawson also required a central intravenous line of antibiotics placed under his clavicle and directly fed into his heart.

On January 3, 1995, Dr. Omey noticed a thick, green sinus draining from the wound. He expected that the drainage would be a chronic, continuing problem for Brent Lawson. Without the removal of half of Mr. Lawson's femur, this condition will never completely clear up. Bone exposure, bone infection, and bone debridement also caused Brent Lawson severe pain and discomfort. The John Peter Smith orthopedics team tried treating his pain with several different pain medications, but none were effective.

Dr. Omey was also very concerned about Brent Lawson's mental state, so he consulted with a psychiatric team. The psychiatric consult found that Mr. Lawson was alert and oriented, but was angry because he was in pain that could not be controlled with any medication. Although psychiatry speculated that Brent Lawson may have "drug seeking behavior," the

exposed and infected bone, as well as the debridements, would cause pain and discomfort.

On February 3, 1995, Brent Lawson was discharged from John Sealy–Fort Worth, and was transferred to a nursing home in Forth Worth (Vista Gardens). At the time of discharge, he still suffered from osteomyelitis and a draining wound. On February 16, 1995, Dr. Omey saw Mr. Lawson at the outpatient clinic. The hip incision had healed and there was no drainage; however, he was still experiencing severe hip pain. On April 19, 1995, Dr. Omey saw Mr. Lawson following complaints of immense hip pain. At that time, he scheduled another surgery for May 1, 1995 for the removal of the antibiotic beads. It took about ten days for the incision from that procedure to heal.

### L. Mr. Lawson's Cure at Vista Gardens Nursing Home

On February 3, 1995, Brent Lawson entered Vista Gardens Nursing Home as a resident patient—and he was still living there at the time of trial. When Mr. Lawson was admitted to Vista Gardens, he was diagnosed with spinal cord injury, paralysis, muscle spasms, depressive disorder, chronic cystitis, and Stage III and IV decubitus ulcers. *He was evaluated to have minimal rehabilitative potential.* The staff monitored the decubitus ulcers on a weekly basis and kept written records of the healing progress. (Pl.Ex. 126.)

At Vista Gardens, Brent Lawson received a ROHO cushion for his wheelchair and a high-density foam pressure reduction mattress for his bed, which was equipped with a trapeze and side rails. (Pl.Ex. 126.) However, *Brent Lawson still complains of chronic pain from which he has had no relief—and because further loss of mobility, he is even more dependent upon the skilled nursing care provided in the nursing home.* (Pl.Ex. 126.)

Mr. Lawson has tried a number of pain relief measures, including oral, intravenous, and intramuscular medications—as well as an electronic pain device (TENS)—but *none has been effective in relieving his chronic pain.* Mr. Lawson experiences intense discomfort and frustration at his need for medication, which impairs his senses and dulls his personality and mental state. He also suffers from genuine apprehension and daily fear that the decubitus ulcers will recur.[16]

### IV. THE APPLICABLE LAW

#### A. Liability

1. This Court has jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. § 1331. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

2. Mr. Lawson's denial of medical care claim under section 1983 is analyzed under the Eighth Amendment to the United States Constitution. The proper inquiry is whether any denial of medical care subjected him to cruel and unusual punishment. *See Hamilton v. Lyons,* 74 F.3d 99, 106 (5th Cir.1996). However, the Eighth Amendment encompasses only punishments that are "repugnant to the conscience of mankind" or "that involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 105–06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Norton v. Dimazana,* 122 F.3d 286, 291 (5th Cir.1997); *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997). The Eighth Amendment imposes on prison officials a duty to provide humane conditions of confinement and to take reasonable steps to ensure the safety of those confined. *See Farmer v. Brennan,* 511 U.S. 825, 831–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling v. McKinney,* 509 U.S. 25, 31–32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Downey v. Denton*

---

**16.** Brent Lawson has developed only one decubitus ulcer during his residence at Vista Gardens; that was on his right buttock, and it was successfully treated before it progressed to Stage IV. (Pl.Ex. 126.)

*County,* 119 F.3d 381, 385 n. 6 (5th Cir. 1997).

■ 3. To prevail on a claim that a prison official violated this Eighth Amendment duty, an inmate must satisfy a two-prong test. First, the inmate must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm and that prison officials were conscious of that risk. *See Farmer,* 511 U.S. at 827, 834, 114 S.Ct. 1970; *Hare v. City of Corinth,* 74 F.3d 633, 648 (5th Cir.1996). Second, the inmate must prove that the prison official was deliberately indifferent to inmate health or safety. *See Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Hare,* 74 F.3d at 648. Acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. *See Farmer,* 511 U.S. at 836, 114 S.Ct. 1970. An inmate can also show deliberate indifference by "proving there are such systematic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir.1980) (citation omitted).

■ 4. However, deliberate indifference cannot be inferred from a prison official's mere failure to act reasonably. *See Hare,* 74 F.3d at 649. The United States Supreme Court has held that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838, 114 S.Ct. 1970. Inadvertent failure to provide adequate care does not constitute the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Estelle,* 429 U.S. at 105, 97 S.Ct. 285. Further, negligent medical care, unsuccessful medical treatment, or erroneous judgment does not constitute a valid section 1983 claim. *See Graves v. Hampton,* 1 F.3d 315, 319 (5th Cir.1993); *Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir.1993); *Varnado v. Ly-*

*naugh,* 920 F.2d 320, 321 (5th Cir.1991). In fact, constitutionally adequate care does not ensure that an inmate will agree with every treatment decision rendered. *See Estelle,* 429 U.S. at 107–08, 97 S.Ct. 285 (holding that a prison doctor's failure to order an x-ray of plaintiff's lower back did not state an Eighth Amendment violation). Disagreements over treatment decisions constitute, at most, claims of malpractice appropriately addressed under state law. *See id.*

■ 5. This Court may only find the Dallas County liable if the constitutional harm to Mr. Lawson resulted from an official policy or custom. *See Monell,* 436 U.S. at 690–94, 98 S.Ct. 2018; *Flores v. Cameron County,* 92 F.3d 258, 263 (5th Cir.1996). An official policy may be either an official policy statement or a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984); *see also Eugene v. Alief Indep. Sch Dist.,* 65 F.3d 1299, 1304 (5th Cir.1995); *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984). The policy of an individual official cannot give rise to governmental liability unless the official was one to whom the governing body had delegated final policy-making authority, not mere discretion or decision-making authority. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Bennett,* 728 F.2d at 769.

■ 6. Failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting the policy will be a deprivation of rights. *See Colle v. Brazos County,* 981 F.2d 237, 245–46 (5th Cir.1993) (citing *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir.1992)). Where the policy is not unconstitutional on its face, the plaintiff must establish that the particular

harm-producing deficiency "resulted from conscious choice," that is, they must supply "proof that the policymakers deliberately chose [measures] which would prove inadequate." *Gonzalez v. Ysleta Indep. School Dist.*, 996 F.2d 745, 755 (5th Cir.1993) (quoting *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)). Succinctly stated, the plaintiff must demonstrate that the County, through its deliberate conduct, was the "moving force" behind the alleged injury. *Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997).

7. The Fifth Circuit has held that a complaint "of unsanitary conditions that deprived [an inmate] of basic human needs and exposed him to health risks" can constitute a section 1983 violation. *Bradley v. Puckett,* 157 F.3d 1022, 1025 (5th Cir.1998) (finding that denying a disabled prisoner who required use of a shower chair the ability to bathe for several months so that the inmate contracted a fungal infection because he was forced to clean himself with toilet water could constitute a section 1983 violation). The Court explained that "when the restrictions of confinement rise to a level that results in physical torture, it can result in pain without penological purpose constituting cruel and unusual punishment under the Eighth Amendment." *Id.*

8. Although the Fifth Circuit in one case found that failure to cure an inmate's decubitus ulcers does not violate section 1983, *see Stewart v. Murphy,* 174 F.3d 530, 535 (5th Cir.1999), that case is distinguishable from the one at bar. In *Stewart,* the prison doctor herself *"personally debrided the ulcers, ordered that the wounds be medicated and dressed,* and monitored Stewart's nutritional levels." *Id. See Harris v. Hegmann,* 198 F.3d 153, 159 (5th Cir.1999) (stating that if Plaintiff alleges facts demonstrating that defendant were made aware of, and disregarded, a substantial risk to Plaintiff health when they

denied him treatment, Plaintiff has stated a claim upon relief may be granted).

### B. *Damages* [17]

■ 1. A plaintiff in a section 1983 action who has established the liability of the defendants is entitled to recover compensatory damages for the physical injury, pain and suffering, and mental anguish that he has suffered in the past—and is reasonably likely to suffer in the future—because of the defendants' wrongful conduct.

2. Of course, compensatory damages may be awarded only for the plaintiff's injuries that were proximately caused by the defendants' wrongful conduct. However, no evidence of the value of intangible things, such as mental or physical pain and suffering, need be introduced.

3. An award of damages should fairly compensate the plaintiff for the injuries he has suffered—and it should be fair in light of all of the credible evidence.

## V. CONCLUSIONS

### A. *Liability*

■ From the detailed facts stated above, it is clear that defendants' denial of adequate medical care to Brent Lawson, a paraplegic, subjected him to cruel and unusual punishment. Indeed, Mr. Lawson was incarcerated at Lew Sterrett jail under conditions posing a substantial risk of serious harm—and the defendants were certainly conscious of that risk and were deliberately indifferent to Mr. Lawson's health and safety in failing to provide even minimal medical care to prevent and treat his decubitus ulcers.

Indeed, the facts discussed above clearly show that the defendants treatment of Brent Lawson was "repugnant to the conscience of mankind" and involved the "unnecessary and wanton infliction of pain." In summary, these are only a few of the

---

**17.** *See* Fifth Circuit Pattern Jury Instructions, Civil, §§ 15.2–15.4 (West 1999).

facts that establish the defendants deliberate indifference to Mr. Lawson's serious medical needs:

> ... the defendants refused to give any assurances to Dr. Benavides (Lawson's doctor at Tri–City Hospital) that Mr. Lawson would receive the necessary antibiotics, daily whirlpool treatment, and dressings;

> ... the defendants also refused to assure Dr. Benavides that Mr. Lawson would be evaluated in a timely manner and, if necessary, transferred to Parkland Hospital;

> ... the defendants rejected Nurse McCormack's attempts to refuse admission of Brent Lawson at Lew Sterrett because she knew he would not receive adequate medical care there;

> ... the defendants refused to consider any alternative placements for Mr. Lawson, such as Parkland Hospital or transfer to TDC;

> ... the defendants knew that Brent Lawson was not receiving his required daily medications, and dressing changes [18] and they did not record Tri–City's and Parkland's medical orders in Mr. Lawson's jail records;

> ... the defendants left Brent Lawson lying in his own feces and on the filthy shower floor after he fell;

> ... the jail nurse's notes do not even reflect the rapidly worsening condition of Brent Lawson's decubitus ulcers, even though Parkland nurses noted that the ulcers were large enough to put a fist into the developing holes;

> ... on his third trip to Parkland Hospital, the doctors refused to release Mr. Lawson to Lew Sterrett *because the jail could not effectively treat him.*

The Dallas County Jail knew it could not adequately care for a paraplegic like Mr. Lawson but admitted him anyway. Each time Mr. Lawson was sent to Parkland because his condition had worsened to such a degree that the jail was unable to treat him, the jail put on notice that it was providing inadequate care for him. Yet the jail continued to take Mr. Lawson back and continued to care for him inadequately until Parkland doctors, on Mr. Lawson's third visit there in six weeks, intervened and arranged for him to be released to the custody of the Texas Department of Corrections. The evidence clearly demonstrates that the jail acted with deliberate indifference, violating Mr. Lawson's constitutional right to be free of cruel and unusual punishment.

### B. *Damages*

 It is also clear that the defendants' wrongful conduct has caused, and will continue to cause, the plaintiff, Brent Lawson, to suffer extreme pain and suffering and mental anguish. He was forced to undergo three surgeries within a six-month period, and he was treated at John Sealy Hospital for almost one year. Mr. Lawson also has extensive scarring and disfigurement on his lower back and buttocks from this surgery. He has only minimal rehabilitive potential.

Accordingly, applying the damage standards discussed above, the Court determines that the plaintiff shall recover from the defendants:

> (i) $150,000.00 for past pain and suffering and mental anguish; and

> (ii) $100.000.00 for future pain and suffering and mental anguish.

It is so ORDERED.

---

**18.** The jail's nursing staff even falsified Lawson's medical records by entries of "refused

dressing changes."